**Mary Jane WICKMAN,**
**Plaintiff, Appellant,**

v.

**NORTHWESTERN NATIONAL**
**INSURANCE COMPANY,**
**Defendant, Appellee.**

**No. 89–2030.**

United States Court of Appeals,
First Circuit.

Heard May 9, 1990.

Decided July 20, 1990.

Edward S. Rooney, Jr., with whom Lyne, Woodworth & Evarts, Boston, Mass., was on brief, for defendant, appellee.

Before SELYA and CYR, Circuit Judges, and ROSENN,* Senior Circuit Judge.

ROSENN, Senior Circuit Judge.

This appeal calls upon us to examine the emerging jurisprudence of the Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1001 et seq.), and presents a question of first impression under the Act concerning the interpretation of life insurance contracts. The issue arises out of the beneficiary's claim for accidental death and dismemberment benefits (AD & D) under a group policy issued by Northwestern National Life Insurance Company (Northwestern) insuring her husband, Paul Wickman (Wickman). Northwestern rejected the spouse's claim, asserting that Wickman's death, which resulted when he fell forty to fifty feet from a bridge, was not accidental.

The widow sued Northwestern in the United States District Court for the District of Massachusetts to recover AD & D benefits.[1] By consent of the parties, a magistrate tried the case and ruled that Wickman's death was not accidental. On appeal, the widow challenges this conclusion, as well as the earlier ruling that ERISA and not state law governed the insurance contract. We affirm.

## I.

### A.

On July 11, 1984, at approximately 4:00 P.M. Michael Blanchette was driving southbound on Route 495 in Middleborough, Massachusetts. As he approached the bridge near the overpass of Route 105 he observed an automobile, later identified as Wickman's, parked in the break-down lane, and Wickman approximately thirty feet

Richard L. Neumeier with whom Parker, Coulter, Daley & White, Boston, Mass., was on brief, for plaintiff, appellant.

* Of the Third Circuit, sitting by designation.

1. The district court initially exercised jurisdiction pursuant to 28 U.S.C. § 1332(a). Upon the dismissal of the common law claims and the addition of the ERISA claims, the district court's jurisdiction was grounded in 29 U.S.C. § 1001 and 28 U.S.C. § 1331. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

away. He saw Wickman standing on the outside of the bridge's guardrail, holding on to it with only his right hand. Blanchette turned his eyes to check on traffic, and upon looking back he saw Wickman no longer holding on to the rail but free-falling to the railroad tracks below.

At the point from which Wickman had been first observed, the bridge had been erected forty to fifty feet above the railroad tracks below. About thirty-five yards further on, the bridge stands ninety feet above the tracks. To reach that point, Wickman would have had to walk head on into high speed traffic.

The bridge guardrail is three to four feet high and is constructed of intermittent vertical concrete posts crossed by three continuous metal horizontal railings. No area or lip extends outside the railing on the bridge for walking or standing. An edge of a steel support beam about one foot below the bridge roadway projects outward for a few inches. The magistrate ultimately concluded, "It is not reasonable to believe that Mr. Wickman either fell over or through the guardrail, or otherwise came to be on the outside through mistake or inadvertence. Clearly it would take a conscious effort to climb over or through the guardrail on the bridge."

Upon seeing Wickman fall, Blanchette pulled over, stopped a tow truck and requested the driver to obtain police and ambulance assistance. Blanchette then ran down the embankment to administer first aid to Wickman. Blanchette treated him for shock and asked him several questions. Wickman told Blanchette his name, occupation, and that he had a family. Blanchette asked Wickman in "two or three different ways" why he had jumped, but Wickman failed to respond.

Blanchette eventually left Wickman and flagged down Trooper Condon, who called for an ambulance and then attended to Wickman. Condon also asked Wickman some general questions, and obtained responses to all of his questions except as to what had happened. Shortly thereafter an ambulance arrived and transported Wickman to St. Luke's Hospital.

Upon admission, Trudy Dooley, the hospital emergency admissions secretary, asked Wickman the standard admissions questions, including who were his next of kin. Though Wickman responded to questions such as name and address, he would not provide at first the next of kin information. Eventually after some prodding, he told Dooley that "they don't care," and "it doesn't matter." When asked about his religion, his initial response also was "it doesn't matter." When Dooley asked what had happened, he told her "I jumped off."

Mrs. Wickman soon arrived at St. Luke's, but by the time she got there Wickman had been heavily medicated. She spoke with him, touched and kissed him, but evidently he did not recognize her for he kept saying, "Where's my wife?" and "I love my wife and I love my children." Soon after, Wickman went into cardiac arrest and was transferred to Brockton Hospital where he died later that evening.

At the Brockton Hospital, Dr. Howard Carpenter, a medical examiner, who had been advised that Wickman had jumped, issued the initial death certificate. He stated the cause of death as suicide. Shortly thereafter, a nurse's note from St. Luke's was brought to Carpenter's attention. The note read, "admission to E.R. post-fall from 50' bridge to rail track, awake oriented X 3, states 'fell.'" Exhibit P8. As Dr. Carpenter explained, oriented times three means oriented to person, place, thing, and time; "[h]e knows who he is, where he is, and what time it is, what day it is." On the basis of this note and no other information, Dr. Carpenter issued an amended certificate, fixing the cause of death as "fall from 90 foot bridge." Dr. Carpenter claims that this is the only death certificate he ever changed in the more than five thousand which he had prepared during his time in the coroner's office.

### B.

At the time of his death, Wickman was covered by a Northwestern issued group life and AD & D policy held by his employer, Dexter Corporation (Dexter). The poli-

cy named his wife as the beneficiary; it provided for payment of life insurance benefits for all causes of death and AD & D benefits if death was accidental. The accidental death provisions provided that an accident was "an unexpected, external, violent and sudden event." The policy also specifically noted that it did not pay benefits if the loss was either directly or indirectly caused by "suicide or intentionally self-inflicted injury, whether ... sane or insane."

The employer Dexter and the employees paid the premiums on the policy to Northwestern. Wickman became eligible for the insurance as a member of the class of Dexter "active full time employees regularly working 32 hours or more per week in a permanent position." As the party ultimately responsible for premium payments, Dexter held title to the policies.

Mrs. Wickman submitted claims to Northwestern under both the accidental death and life insurance policy provisions. She received a benefit payment of $105,000 on the life insurance policy. Following its investigation, Northwestern denied her claim for an equal amount under the accidental death provisions. The Company wrote to claimant's counsel:

> The policy defines accident as an unexpected, external, violent and sudden event. It further provides that we do not pay benefits for loss directly or indirectly caused by suicide or intentionally inflicted injury whether sane or insane. According to the police report the Insured's wife stated that her husband had been seeing a psychiatrist and had talked about suicide. The Death Certificate also indicates that the cause of death was suicide. Because the Accidental Death provision of the policy excludes payment of benefits for suicide, we do not believe Accidental Death Benefits are payable.

Exhibit D1.

In her suit, the spouse asserted a claim for breach of contract and requested a jury trial. She alleged that Wickman had not committed suicide, but ended up on the wrong side of the guardrail when he became disoriented while looking for help after his car broke down. His car had been retrieved by his daughter from the police the day after his death. She drove the car away without any difficulty, and a subsequent mechanical inspection found no defect. The widow also asserted that her husband, a devout Catholic, would not commit suicide, and that he was in the midst of planning a vacation. Finally, she alleged that he showed no signs of depression, and had never contemplated suicide.

The district court, upon Northwestern's motion, dismissed the complaint, holding that the insurance policy was a part of the plan governed by ERISA, and as such ERISA preempted any state law claims. The court allowed plaintiff leave to amend, and she amended the complaint to add claims under ERISA. The court, in reliance upon its earlier decision, summarily dismissed the common law claim. The parties agreed that there was no right to a jury trial in an action for benefits brought under ERISA and consented to a trial before a United States Magistrate.

After a full trial, the magistrate performed a de novo review of the facts and determined that Wickman's death was not accidental. He denied the widow's claim for AD & D benefits. He found that Wickman had intentionally climbed over the guardrail, and that in so doing he was "substantially certain" that he would suffer significant injuries, if not death. Specifically, "the court [found] that Mr. Wickman knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of his volitional act of placing himself outside of the guardrail and hanging on with one hand." *Id.* at 67–68. The court held as a matter of law that the insured did not lose his life because of an accident as defined under the policy. His widow now appeals this ruling and, in the alternative, challenges the magistrate's prior ruling that ERISA preempted her common law claim.

## II.

The threshold question in this case is whether plaintiff's claim is properly

a claim under ERISA, or, in the alternative, a claim under state law. 29 U.S.C. § 1003(a) provides that ERISA supersedes any and all state law, except for state insurance, banking, and securities regulation. Under this section, a claimant's common law contract and torts claims asserting the improper processing of a claim for benefits under an ERISA regulated insurance policy are pre-empted. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 57, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987). Insurance coverage which is part of an ERISA plan is regulated under ERISA. *See id.* at 48, 107 S.Ct. at 1553. The magistrate, finding that the AD & D policy at issue here was part of an ERISA plan, held that the widow's claims were limited to those under ERISA. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 62–63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987).

■ ERISA applies to:
any employee benefit plan if it is established or maintained—
(1) by any employer engaged in commerce or actively affecting commerce; or
(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or
(3) both.

29 U.S.C. § 1003(a). The question of whether an ERISA plan exists is "a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Kanne v. Connecticut General Life Ins. Co.,* 867 F.2d 489, 492 (9th Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989).

■ In a cursory fashion, the statute defines an employee benefit plan as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). As one court has noted, a welfare benefit plan under ERISA requires five essential constituents:

(1) a plan, fund or program (2) established or maintained (3) by an employer or by an employee organization, or by

both (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries.

*Donovan v. Dillingham,* 688 F.2d 1367, 1370 (11th Cir.1982) (en banc). There is no dispute that the last three prerequisites were met in this case. The real dispute is whether this is a plan which the employer "established or maintained."

■ The court in *Donovan* also formulated the prevailing standard for determining whether a plan has been established.

In summary, a "plan, fund or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.

*Id.* at 1373. As the magistrate points out, this test is easily met in this case and the plaintiff-widow never contests that the intended benefits were accident insurance benefits. The beneficiaries were full-time employees and their appointed beneficiaries. Dexter, the employer, financed the plan and possibly also employee contributions. Dexter fixed a formal claim procedure, which the widow in fact used. The plaintiff contends, though, that to be a plan there must be something more: the mere purchase of insurance is not enough to constitute a plan. *See Taggart Corp. v. Life & Health Benefits Admin.,* 617 F.2d 1208, 1211 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).

The plaintiff's basic assertion that a mere purchase of insurance does not constitute a plan is correct, though in this case there is more than a mere purchase of insurance. In *Taggart,* relied upon by the widow, the employer acted solely as a channel for payments from the employee to a trust fund which purchased the group insurance. The employer "neither directly nor indirectly own[ed], control[led], admin-

ister[ed], or assume[d] responsibility for the policy or its benefits." *Id.* All it did was deduct funds from the employee's pay check, and transfer the funds to the trust fund. Significantly, there was only one employee covered under that insurance, the employer's only employee.

*Taggart*, thus, does not stand for the proposition "that an employer or employee organization that only purchases a group health insurance policy or subscribes to a [multiple employer trust] to provide health insurance to its employees or members cannot be said to have established or maintained an employee welfare benefit plan." *Donovan*, 688 F.2d at 1375. In fact, "the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established." *Id.* at 1373. *Taggart* is merely a recognition that ERISA is not intended to cover situations where the employer merely "advertises" insurance, and then makes voluntary deductions from employees' paychecks. *See* 29 C.F.R. § 2510.3–1(j).

■ The crucial factor in determining if a "plan" has been established is whether the purchase of the insurance policy constituted an expressed intention by the employer to provide benefits on a regular and long term basis. *See Ed Miniat, Inc. v. Globe Life Ins. Group*, 805 F.2d 732, 739–41 (7th Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). For example, in *Donovan* the court paid particular attention to the written agreement that the employers had to either provide benefits or "purchase benefits for a substantial percentage of a class of employees or members under circumstances tending to show an anticipated continuing furnishing of such benefits." *Donovan*, 688 F.2d at 1374–75. Significantly, there were no indicia of a long term commitment in *Taggart*, where it appears the benefits, what little they amounted to, had no sense of permanence. *See Taggart*, 617 F.2d 1211.

In this case, the purchase of the insurance was not an isolated and aberrational incident, limited only to accident insurance, or simply to Wickman. Dexter provided a comprehensive insurance program, offering health, medical, dental, and life insurance, as well as several other forms of insurance and benefits. Exhibit P17. It distributed a handbook containing a listing of ERISA rights and a summary plan description. Such a booklet, detailing ERISA rights, is strong evidence that the employer has adopted an ERISA regulated plan. *See Kanne*, 867 F.2d at 493. The Company here also contemplated and devised specific insurance eligibility requirements. Apparent from this degree of planning, precision, and detail is that the purchase of the group policy was not an aberrational or singular act, but represented Dexter's calculated commitment to qualified employees for similar benefits regularly in the future. Thus, the group accident insurance formed a considered employer plan under ERISA, making the plaintiff's claims under the policy subject exclusively to ERISA's jurisdictional requirements.

## III.

Having crossed the ERISA threshold, we must now determine whether the magistrate correctly ruled that Wickman's death was not the result of an accident, and whether he properly denied the widow's claim for accidental death benefits. The magistrate found that there were only three possible explanations for Wickman's actions: Wickman intentionally projected himself over a dangerous visible void intending to (1) commit suicide, (2) seriously injure himself, or (3) having so positioned himself, fell inadvertently or mistakenly. The magistrate ruled that under the first two scenarios the policy exclusion of losses resulting from suicide or intentionally self-inflicted injury controlled and mandated denial of the claim. Assuming arguendo the third scenario, an inadvertent or mistaken fall, he held that even if Wickman had no specific intent to injure or kill himself, "the harm that befell him was substantially certain to happen." Once Wickman intentionally climbed over the guardrail and suspended himself with one hand, the magistrate found that serious bodily injury was substantially certain. This, he found, is

not a case where the insured "intentionally did an act with some unexpected result." He therefore concluded as a matter of law that the insured did not lose his life due to an accident as defined under the policy or Massachusetts law. The widow challenges the legal conclusions drawn by the magistrate. She contends that under the second and third hypotheticals, Wickman died accidentally and, absent an explicit finding of suicide, she is entitled to the policy benefits.

### A.

■ The benefit provisions of an ERISA regulated group life insurance program must be interpreted under principles of federal substantive law. *Pilot Life Ins.*, 481 U.S. at 56–57, 107 S.Ct. at 1557–58. *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989). The federal common law on the issue of insurance benefits is still in its formative stage but "must embody common-sense canons of contract interpretation." *Id.* Nonetheless, in developing the federal common law, it is not inappropriate that we examine the various state law approaches, states generally having had much more experience in the area of insurance contract interpretation. Borrowing those concepts which are best reasoned may be prudential.

■ Applying the basic tenets of contract interpretation, the first place to look for a definition is in the terms of the policy contract itself. *Id.* These terms must be given their plain meanings, meanings which comport with the interpretations given by the average person. *See Hoffman v. Life Insurance Co.*, 669 P.2d 410, 416 (Utah 1983); *Knight v. Metropolitan Life Ins. Co.*, 437 P.2d 416 (Ariz.1968); 10 *Couch on Insurance 2d*, § 41:9, 13 (1982). Courts have also held, nearly unanimously, "that insurance contracts must be liberally construed in favor of a policyholder or beneficiary ... and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance."

13 Appleman, *Insurance Law and Practice* § 7401 at 197 (1976). *See Howard v. Federal Crop Ins. Corp.*, 540 F.2d 695 (4th Cir.1976); *Rezendes v. Prudential Ins. Co.*, 285 Mass. 505, 189 N.E. 826 (1934).

The policy in this case specifically provides that benefits will not be paid "for loss directly or indirectly caused by ... [s]uicide or intentionally self-inflicted injury, whether [insured is] sane or insane." We are bound by this plain language, and we may not distort it in an effort to achieve a desirable or sympathetic result. The language, in the clearest of terms, denies benefits if Wickman committed suicide, the magistrate's first scenario.

Similarly, if Wickman merely attempted to injure himself, and did not specifically intend to kill himself (scenario two), again no benefits would be due his widow. His death would have been "indirectly caused" by his attempt to injure himself. The plain language of the policy denies benefits under such a circumstances. To read the policy in any other way would be to give no effect to the contractual clause "directly or indirectly caused by," a result inconsistent with the basic rules of contractual interpretation. Thus, the magistrate correctly ruled that under his first two scenarios, Northwestern would not be liable under the policy to the plaintiff for accidental death benefits.

This still leaves us with the more vexing questions raised under the magistrate's third scenario: whether the widow is due benefits if Wickman climbed over the guardrail without any intent to kill or injure himself but fell inadvertently. The resolution of this hypothesis requires that we delve into the metaphysical conundrum of what is an accident.

### B.

■ In defining the term "accident," as in other terms used in an insurance contract, we, of course, first look at the contract. The language in this contract, though, is somewhat less than dispositive.[2]

2. The contract, in its relevant portion, reads:

What is the Accidental Death and Dismemberment (AD & D Benefit: We pay AD & D

It defines "accident" as "an unexpected, external, violent, and sudden event." It is undisputed that the fall was external, violent, and sudden, but the parties disagree over whether it was unexpected. Northwestern contends that when Wickman climbed over the railing and extended himself from the bridge he must have expected that he would fall and kill or, at least, significantly injure himself. His widow contends that only if Wickman intended to commit suicide could the incident not be an accident; otherwise, he would not have expected to die. The question comes down to what level of expectation is necessary for an act to constitute an accident; whether an intentional act proximately resulting in injury or only the ultimate injury itself must be accidental.

A survey of state judicial interpretations of "accidental" reveals that there are essentially two approaches to determining whether an injury was "unexpected" and thus "accidental." In developing federal common law, it would be jurisprudential to analyze each of these approaches and determine which is the soundest and most consonant with the spirit of ERISA in promoting fair and equitable settlements of claims, as well as in promoting the formation of employee benefit plans. *See Pilot Life*, 481 U.S. at 54, 107 S.Ct. at 1556.

The first approach distinguishes between accidental means and accidental results. Under this approach, where the insurance contract insures against "accidental means," the means which produced death or injury must have been unintentional. According to this interpretation, if the act proximately leading to injury is intentional, then so is the result, even if the result itself was neither intended nor expected. To constitute an accident under this standard, the *cause* of the injury, as Couch explains, must be "unforeseen, unexpected, and unusual; happening or coming by chance without design, that is casual or fortuitous, as opposed to designed or intended." 10 *Couch on Insurance 2d* § 41:28, 40 (1982).

A court only will focus on "accidental means," though, if the language of the contract specifically speaks of accidental means. The contract in this case defines an accident in terms of an event. This would be the type of language which would prompt courts recognizing the distinction between "means" and "results" to look at the "means," because only the means can be termed an event. These courts would reason that if the contract had intended a "result" analysis, it would have spoken of an unexpected injury, not an unexpected event. Similarly, "violent, external, and sudden" terms concentrate upon the cause of the injury, not upon the injury itself.

The United States Supreme Court, in a landmark case, applied the means/result distinction and determined that a man who died of heat stroke while golfing had not died of accidental means. The Court reasoned that because the insured had intentionally played golf and exposed himself to the hot sun for a long period of time, the means of his death, overexposure to the sun, was not accidental. *Landress v. Phoenix Mutual Life Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934).[3] Justice Cardozo dissented, harshly criticizing the "artificial" distinction between accidental means and results. He noted that:

> "Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident." Halsburg, L.C. in *Brintons v. Turvey*, L.R. [1905].... On

benefits if you lose your life, limb, or sight due to accidental injury.
Under what conditions do we pay benefits? We pay benefits if all of the following are true:
—You are covered by AD & D Insurance on the date of the accident.
—Loss occurs within 180 days of accident.
—The cause of the loss is not excluded.
It is evident from this clause that an injury must be accidental to qualify for AD & D Benefits.

Thus, for the plaintiff to have made out a prima facie case, she had to establish that Wickman's death was an "accident" within the terms of the policy.

3. *Landress* preceded *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and, thus, is no longer binding as federal common law.

the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company.

.     .     .     .     .

When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means.

*Id.* at 499 (citations omitted). Cardozo forewarned that adherence to the distinction would "plunge this branch of the law into a Serbonian Bog." *Id.*

Time has borne out Cardozo's prediction. As the Texas Supreme Court has noted:

Texas courts have waded through Justice Cardozo's Serbonian bog, and we are now convinced that the terms "accidental death" and "death by accidental means," as those terms are used in insurance policies, must be regarded as legally synonymous. . . .

*Republic National Life Insurance Company v. Heyward,* 536 S.W.2d 549 (Tex. 1976); *see also Beckham v. Travelers Ins. Co.,* 424 Pa. 107, 225 A.2d 532, 535 (1967) ("Our own cases have also confirmed Cardozo's prediction. . . ."). Other courts have been equally frustrated by the means/injury distinction, which has "shrouded [this branch of law] in a semantic and polemical maze," and forced courts applying the distinction to resort to "tortuous and tortured legal jiujitsu)." Annotation, *Insurance: "Accidental Means" as Distinguishable from "Accident," "Accidental Result," "Accidental Death," "Accidental Injury," etc.,* 166 A.L.R. 469, 477 (1947).

In recent years, courts consistently have rejected the distinction between accidental means and accidental results noting that: it is illogical to purport to distinguish between the accidental character of the result and the means which produce it; that the distinction gives to "accidental means" a technical definition which is not in harmony with the understanding of the common man; and that the ambi-guity found in the concept should be resolved against the insurer so as to permit coverage.

10 *Couch on Insurance 2d* § 41:31, 50 (1982); *see also Page Flooring and Constr. Co. v. Nationwide Life Ins. Co.,* 840 F.2d 159, 162 (1st Cir.1988) (Coffin, J., dissenting) (urging the interpretation prevailing in an increasing number of jurisdictions that the two terms be construed as synonymous and rejecting the distinction between "accidental means" and "accidental results" as artificial and confusing). Having reviewed the pertinent state court decisions, we conclude that the better reasoning rejects the distinction. Thus, we elect to pursue a path for the federal common law which safely circumvents this "Serbonian Bog."

### C.

This election, however, does not resolve the debate over what constitutes an accident nor does it resolve the case before us. In ultimately determining what is an accident, we are still left with questions concerning the standards by which to judge the insured's expectations. The plaintiff advances the argument that anything short of specifically intended injury is an accident. The magistrate, though, disagreed with this proposition and ruled that even if Wickman did not intend to kill or injure himself, he did not die accidentally. Despite the widow's contention, the magistrate did not apply an "intentional means" analysis in reaching this conclusion, but instead determined that Wickman either actually expected or reasonably should have expected the ultimate result which befell him. Because of this expectation—not merely because the means of death was voluntary—the magistrate held that Wickman's death was not accidental.

Defining accident has troubled the state and federal judiciaries for years. Probably the best definition is Cardozo's tautology that an accident is what the public calls an accident, which aids jurists in deciding individual cases only slightly. As the late Justice Musmanno of the Pennsylvania Supreme Court bemused:

What is an accident? Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts made out an accident, the question may not yet be settled, and it must be reheard in an appellate court.

*Brenneman v. St. Paul Fire and Marine Ins. Co.,* 411 Pa. 409, 192 A.2d 745, 747 (1963); *see Burr v. Commercial Travelers Mut. Acc. Ass'n,* 295 N.Y. 294, 301, 67 N.E.2d 248, 166 A.L.R. 462, 466 (N.Y.1946) ("Philosophers and lexicographers have attempted definition with results which have been productive of immediate criticism. No doubt the average man would find himself at a loss if asked to formulate a written definition...."). Much of the inconsistency in the case law defining and applying the definition of accident is traceable to the difficulty in giving substance to a concept which is largely intuitive. Recognizing this problem, we continue our trek across this judicial morass realizing that some mud on our boots may be inevitable. Nonetheless, we continue to strive to avoid miring in a "Serbonian Bog."

Case law is fairly consistent in defining an accident, using equally ambiguous terms such as undesigned, unintentional, and unexpected. *See Beacon Textiles Corp. v. Employees Mut. Liab. Ins. Co.,* 355 Mass. 643, 246 N.E.2d 671, 673 (1969); 1A Appleman, *Insurance Law and Practice* § 360, 449 (1982). The contract at issue here uses the term "unexpected." These terms offer no guidance in determining from whose perspective they should be judged. The common law has filled this gap, to a certain extent, by prescribing that these terms should be judged from the viewpoint of the insured. *See Id.* at 450–52; *Estate of Wade v. Continental Ins. Co.,* 514 F.2d 304, 306–07 (8th Cir.1975).

The plaintiff would have us rule that this common law premise means that unless Wickman actually expected to die, essentially that he specifically intended to commit suicide, his death must be considered an accident. Such a strict definition from the perspective of the insured suffers from two imperfections, both of which make the test inappropriate in certain cases. The first difficulty comes in cases where an insured's expectations, virtually synonymous with specific intent, are patently unreasonable.

To illustrate, there are several reported cases of people who have participated in games of Russian roulette [4] not expecting or intending that they be killed, evidently entertaining a fanciful expectation that fate would inevitably favor them. The courts have generally held that the insureds' deaths in these cases, regardless of actual expectation or intention, were not accidental. *See Nicholas v. Provident Life & Acc. Ins. Co.,* 61 Tenn.App. 633, 457 S.W.2d 536 (1970); *Koger v. Mutual of Omaha Ins. Co.,* 152 W.Va. 274, 163 S.E.2d 672 (W.Va.1968); *Thompson v. Prudential Ins. Co.,* 84 Ga.App. 214, 66 S.E.2d 119 (1951). When a person plays a game like Russian roulette and is killed, the death, to use Cardozo's test, would not be publicly regarded as an accident. *See also Allred v. Prudential Ins. Co.,* 247 N.C. 105, 100 S.E.2d 226 (1957) (no accident where insured, a fifteen year old boy, intentionally laid down lengthwise in the middle a highway and was subsequently run over and killed). To allow recovery in such circumstances would "defeat the very purpose or underlying function of accidental life insurance." *Kennedy v. Washington National Ins. Co.,* 136 Wis.2d 425, 401 N.W.2d 842, 846 (Ct.App.1967).

The second difficulty with a test relying upon actual expectation is that actual expectation is often difficult, if not impossible, to determine. As one court has noted, "the subjective state of the mind of the

---

**4.** A game where the participants inject one bullet in one chamber of a pistol, spin the barrel, place the pistol to their heads, and pull the trigger. A player playing by the rules will not make any effort to check if the firing chamber is empty before pulling the trigger. Thus, essentially a participant relies solely upon fate to determine if he or she will be shot.

insured cannot be generally known." *Hoffman v. Life Ins. Co.*, 669 P.2d 410, 419 (Utah 1983). Generally, to make an "accident" solely dependent upon actual expectation compels courts and jurists to hypothesize and speculate. As in a case like this, where there are only vague clues as to what Paul Wickman actually thought when he climbed over the guardrail, efforts to recreate a person's actual expectations encounter the evident risks of error and frustration. It is an uncertain and too often a hopelessly blind search for the truth.

■■■ Notwithstanding these problems, we do not suggest actual expectation should be wholly ignored, for in most cases actual expectations govern the risks of an insurance policy a beneficiary believes has been purchased. Generally, insureds purchase accident insurance for the very purpose of obtaining protection from their own miscalculations and misjudgments. *See Knight v. Metropolitan Life*, 103 Ariz. 100, 437 P.2d 416 (1968); 1A Appleman, *supra* § 360, 454. Thus, the reasonable expectations of the insured when the policy was purchased is the proper starting point for a determination of whether an injury was accidental under its terms.

■■■ If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable. *See New York Life Ins. Co. v. Harrington*, 299 F.2d 803, 806 (9th Cir.1962). This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance. If the fact-finder determines that the suppositions were unreasonable, then the injuries shall be deemed not accidental. The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. *See, e.g., Ward v. Penn Mutual*

*Life Ins. Co.*, 352 S.W.2d 413, 423 (Mo.Ct. App.1961) (finding accident where man fell off top of moving car; he had performed the stunt previously, knew, and trusted the driver, was strong, and had a good grip); *Oldring v. Metropolitan Life Ins. Co.*, 492 F.Supp. 994 (D.N.J.1980) (finding an accident where owner experienced in use of gun, after having examined the gun and thinking it was empty, pointed and fired the gun at his head, killing himself); *Knight v. Metropolitan Life Ins. Co., supra*, (finding accidental the death of professional diver after diving off the Coolidge Dam; he previously had completed the same dive without injury).

■■■ Finally, if the fact-finder, in attempting to ascertain the insured's actual expectation, finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations. *See Hoffman*, 669 P.2d at 419. In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct. *See City of Carter Lake v. Aetna Cas. and Sur. Co.*, 604 F.2d 1052, 1058–59 & n. 4 (8th Cir. 1979). An objective analysis, when the background and characteristics of the insured are taken into account, serves as a good proxy for actual expectation. Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured. *See Sanders v. Prudential Ins. Co.*, 697 S.W.2d 80 (Tex.Ct.App.1985).

### D.

■■■ Applying these concepts, we believe that the magistrate did not err in ruling that Wickman's death was not an accident within the terms of the insurance policy.[5] The linchpin of the magistrate's

---

5. Because the magistrate decided there was no accident in this case, and we affirm on this basis, he did not and we need not reach the question of whether Wickman's death was actu-

ally a suicide. The failure to reach this issue makes the presumption relating to the death certificate and the presumption against suicide, relied upon extensively by the plaintiff, irrele-

findings was his conclusion that "Wickman knew or should have known that serious bodily injury or death was a probably consequence substantially likely to occur as a result of his volitional act in placing himself on the outside of the guardrail and hanging on with one hand." This finding equates with a determination either that Wickman expected the result, or that a reasonable person in his shoes would have expected the result, and that any other expectation would be unreasonable.

If he actually expected the result, even if he did not specifically intend it, then his actual expectations make his death *not* accidental. It appears that the magistrate hedged his opinion with the "should have known" language because the third scenario, that Wickman went out on the rail for reasons other than to injure or kill himself, was undeveloped and unsubstantiated at trial. The plaintiff never proffered a specific alternate explanation for Wickman's actions, leaving the magistrate to conjecture.[6] Under such circumstances, it certainly can be said that there was insufficient evidence, assuming *arguendo*, as did the magistrate, the accuracy of the third scenario, to reach a conclusion as to Wickman's actual expectation. Thus, the magistrate appropriately engaged in an objective analysis.

The magistrate's conclusion that Wickman "should have known" that death or injury was "substantially likely to occur" is not in error either legally or factually. Legally, "should have known" is synonymous with, if not even a higher standard than, the reasonable expectation standard we promulgated above. Similarly, "substantially likely to occur" is an equivalent, if not tougher, standard to "highly likely to occur." Thus, the magistrate applied an acceptable legal standard, and did not commit an error of law.

The plaintiff has never seriously challenged the accuracy of the factual conclusion. She largely concedes that a reasonable person in Wickman's shoes would have expected to die or be seriously injured as a result of climbing over the guardrail and hanging on with only one hand. Such a concession, given the height of the bridge, the narrow foothold, that Wickman possessed no extraordinary gymnastic, acrobatic, or other athletic skills, and the absence of evidence that would have enabled him to hold on, is not surprising. Thus, the magistrate's conclusion that Wickman's death was to be reasonably expected is not clearly erroneous.

## IV.

In sum, we conclude that this case is governed under ERISA, and that applying federal common law under ERISA, Paul Wickman's death did not constitute an accident within the terms of his group accident insurance policy. Wickman either subjectively expected serious injury, or the evidence was inconclusive as to his subjective expectation. Objectively, he reasonably should have expected serious injury when he climbed over the guardrail and suspended himself high above the railroad tracks below by hanging on to the guardrail with only one hand.

Accordingly, the judgment below is AFFIRMED.

---

vant. We do note, in passing, that these presumptions are not irrebuttable, and only exist to shift the burden of going forward with the evidence to the party arguing suicide. *See* Fed.R. Evid. 301; *Republic National Life Ins. Co. v. Heyward,* 536 S.W.2d 549 (Tex.1976); *Equitable Life Assur. Soc. v. Irelan,* 123 F.2d 462, 464 (9th Cir.1941).

**6.** At trial the plaintiff explained her husband's actions as an errant ending up on the outside of the guardrail, making the action which led to the injury unintentional and unexpected, thus accidental. The magistrate directly found that Wickman intentionally climbed over the guardrail, thus rejecting this interpretation of the incident. This finding of fact, which is not clearly erroneous, is not challenged by the widow.