Joetta MCELYEA Plaintiff

v.

**AIG LIFE INSURANCE COMPANY and American Greetings Corporation, Defendants.**

No. 1:03CV00101GH.

United States District Court, E.D. Arkansas, Northern Division.

July 19, 2004.

---

Howard Gregory Campbell, Esq., Little Rock, AR, for Plaintiff.

Byron L. Freeland, Esq., Little Rock, AR, for Defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Plaintiff filed this action in the Circuit Court of Jackson County, Arkansas, alleging breach of contract and bad faith against defendant AIG Life Insurance Company ("AIG") based on the denial of benefits under an accidental death and dismemberment policy, with AIG insuring the life of Louis McElyea. Because plaintiff seeks recover of benefits under an employee welfare plan governed by the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § § 1001 *et seq.*, AIG removed the action to federal court.

Plaintiff has an accidental death and dismemberment policy ("AD & D")with AIG ("Policy") insuring the life of Louis McElyea ("McElyea" or "Louis"), her spouse, at the time of his death. American Greetings Corporation, plaintiff's employer, is the plan sponsor and administrator, AIG is the claims administrator for the AD & D benefits and admits that it is a fiduciary within the meaning of ERISA.

McElyea was killed by multiple gun shot wounds during an altercation on July 4, 2002. Plaintiff submitted a claim for benefits due under the policy on August 7, 2002. Under the terms of the Policy, if plaintiff is entitled to the AD & D benefits, she would receive 60% of five-times her annual salary plus $25,000.00. Defendants have denied plaintiff's claim.

In her claim, plaintiff stated that she and Louis were at a party when Devon Reynolds and Gene Beshears "slowed down to agitate Louis. When they sped up, Louis left after them. I have a child by Mr. Reynolds and Louis was going to talk to him about dropping custody papers and possibly had intentions of beating Mr. Reynolds up." (JM–AIG–0118).

By letter dated September 24, 2002, AIG notified plaintiff that it was obtaining a complete police report, autopsy/toxicology report and Medical Examiner's report to properly evaluate the claim. AIG investigated the claim. According to Lt. Charles Vaughn of the Jackson County Sheriff's Department. McElyea and Devon Reynolds had been having problems with each other for about 1½ years before the shooting. McElyea's wife, the plaintiff, had an affair with Reynolds and became pregnant. Lt. Vaughn reported that McElyea had a bad temper and had been arrested on a number of occasions. About a month before the incident, McElyea beat up Reynolds so badly Reynolds had to go to the hospital. (JM–AIG–0085)

AIG did not receive the autopsy report or complete police reports until on or about March 14, 2003, despite repeated requests for them. (JM–AIG 0065; JM–AIG 0096; AM–AIG 0097). The events of July 4, 2002 described below are from the

police reports completed the date of the incident.[1]

Lt. Vaughn stated that:

On Thursday night 07–04–02 at approximately 8:07 P.M., the Sheriff's department received a call in reference to an ambulance being needed at an unknown location south of Beedeville Arkansas.... When I arrived at the scene at approximately 9:11 P.M. I was advised by Lt. Morris and Deputy Benish that they had two in custody Devon Alfred Reynolds and David E. Beshears, and that Louis Earl McElyea had been shot. A firearm, a RG .22 caliber revolver was found at the scene by Investigators. Further inspection revealed that three rounds had been fired from the firearm and three rounds unfired...

At 10:35 P.M., I advised Devon Reynolds of his Miranda Rights and did a taped interview. Devon stated that he and Gene Beshears were riding around when they saw Louis at Keith Baumgarners house on Highway 37 south of Beedeville as they passed. As they turned on Jackson 168 Devon said that he saw something behind him with one headlight, and thought it was Louis on his motorcycle. Devon told Gene Beshears that he thought that Louis was following them. Devon stated that after a short time the headlight disappeared and he told Gene that he thought Louis had turned around. At the intersection of Jackson 168 and 166 Devon stated that something came through the back window of his truck (which was a full can of beer) Devon looked in his mirror and saw Louis coming up by the side of the truck, and Devon locked his door and rolled up his window. Louis was trying to get into the truck at this time. Gene told Devon that they were going to have to deal with this now. Gene got out of the truck on the passenger side and started around the truck when he was meet by McElyea. McElyea hit Beshears on the right side of the face knocking him to the ground. Devon said that he got out of the truck and McElyea came charging around the truck to Devon. Devon said that he told Louis not to come any closer, and when Louis didn't stop he fired at Louis what he thought was two times. Devon stated that Louis came up to him and put his hand on him then stopped and turned around and walked back to his motorcycle and tried to pick up the motorcycle. At that time Louis collapsed on the motorcycle. Devon stated that he helped Beshears up, and then went to McElyea and saw blood coming from his mouth. Devon then tried to get McElyea into the back of his truck to take him for help, but he was unable to get him in the truck. Devon then called his parents and told them what had happened, and they call for the Sheriff's office and EMS.

At 11:04 P.M. I advised David Eugene Beshears of his Miranda right and interviewed him. Beshears stated that he had seen McElyea earlier in the afternoon while he and Devon was at David McAllister's house in Beedeville and McElyea had pointed at them and made threatening gestures to them. Beshears stated that he and Devon had left McAlester's house and was going to drive around by the river while they were waiting for their supper to get ready. They had saw McElyea at Baumgarners residence when they passed, after they passed Baumgarner house they turned

---

1. The Court notes that the reports contain a number of typographical and grammatical errors. The Court has not corrected them but has copied the relevant portions of the reports as originally written.

on Jackson 168 and Devon told him that he thought McElyea was following them. After traveling a short distance Devon said that he thought McElyea had turned around because he didn't see the headlights from the motorcycle. Beshears said that when they stopped at the intersection something came through the back glass. He said that he saw McElyea coming around the truck to the drivers side and he Beshears said he got out of the truck and McElyea turned on him and knocked him to the ground, Beshears said that is the last thing he can remember until Devon was trying to get him up from the ground.

(JM–AIG–0068–69)

Deputy Chuck Benish, who was dispatched to the scene on July 4th states:

I asked the individuals what had happened and no one said anything. I asked again and Gene Besheres advised that the individual, Louis McElyea had thrown something at their truck and broke out the back glass. He advised they stopped and Louie hit him in the side of the head and almost knocked him out. He advised if I needed anything else I would need to ask someone else. I asked the people standing around who knew anything else about this incident. Devon Reynolds advised me that he had shot Louie. I asked him that he advised me he had shot Louie and he advised that after Louie had knocked Gene down he had started after him. He advised he told him to stop but he kept coming after him. He told me the gun was in the front of the pick up truck.

JM–AIG–0125

An autopsy examination showed the presence of three separate gunshot wounds. One had entered McElyea on the top left side of the scalp. A second gunshot wound entered just above McElyea's left collarbone. A third wound entered McElyea's body on the extreme left side of the back, just behind the armpit area. (JM–AIG–0077).

On July 8, 2003, AIG notified plaintiff that, although in receipt of the relevant reports, it was unable to determine whether McElyea was the aggressor, thereby barring payment of accidental death benefits under the Policy, and therefore, it had requested a legal opinion. (JM–AIG–0045). AIG received the legal opinion on September 24, 2003. The September 15, 2003 opinion letter stated that, based on the facts and the law, McElyea's death was not an accident and therefore plaintiff's claim should be denied. (JM–AIG 0009–0016). Plaintiff filed suit on October 3, 2003, before AIG issued its determination letter.

AIG's denial letter, prepared on November 3, 2003, but never sent to plaintiff, states the following as the reason for denying benefits.

The pertinent policy provisions are as follows:

*Injury means bodily injury caused by an accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of all other causes in loss. Accidental Death Benefit. If Injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury, the Company will pay the Principal sum.*

Our review and evaluation revealed that your spouse's death was the result of a foreseen incident. According to the information received your spouse and Mr. Reynolds has [sic] had a long and violent history. The two men knew each other very well and should have known of the other's capability. Prior to actually shooting your spouse, Mr. Reynolds

warned him that if he continued to approach, he would shoot. By all accounts, your spouse continued to approach in the face of this warning. This policy is an accidental death policy, which covers the loss if it was the result of an accident direct and independent of all other causes. This policy does not cover any loss that is the result of a foreseen incident. Therefore, no benefits are payable. (JM–AIG–0004).[2]

█ "[D]enial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Here, the parties agree that the Policy does not grant the administrator or fiduciary discretionary authority. Therefore, the Court reviews this case under a *de novo* standard.

█ "In applying the de novo standard of review, the 'straightforward language in an ERISA-regulated insurance policy should be given its natural meaning.'" *Burnham v. Guardian Life Ins. Co.,* 873 F.2d 486, 489 (1st Cir.1989) (citation omitted). "In conducting a de novo review, the court is bound by the provisions of the documents establishing an employee benefit plan 'without deferring to

either party's interpretation.'" *Parker v. Danaher Corp.,* 851 F.Supp. 1287, 1290 (W.D.Ark.1994)(quoting *Brown v. Ampco–Pittsburgh Corp.,* 876 F.2d 546, 550 (6th Cir.1989)).

The relevant portions of the Policy provide:

**Accidental Death Benefit.** If Injury to the Insured Person results in death within 365 days of the date of the accident which caused the injury, the Company will pay the Principal Sum. (JM–AIG–0136)

**Injury**—means bodily injury caused by an accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independent of all other causes in loss. (JM–AIG–0134)

**Exclusions.** This Policy does not cover any loss caused by or resulting (in whole or in part) from the following:

1. suicide or 'any attempt thereat [sic] or intentionally self-inflicted injury or any attempt thereat [sic] ... (JM–AIG–0137)

McElyea was an "insured person" under the Policy. The Policy does not define "accident" and does not include a felony exclusion. The issue, then, is whether McElyea's death was accidental.[3]

█ When addressing questions of insurance policy interpretation not addressed by a particular ERISA section,

2. In AIG's answer filed on November 24, 2003, AIG stated that plaintiff is not entitled to benefits because McElyea's death was caused by a "self-inflicted injury when he acted as the aggressor in the assault on a third party." (Answer, para. 30; see also para. 13). However, in its answer to the first amended complaint, defendants no longer rely on the "self-inflicted" language as a basis for denial of benefits. They state that" McElyea's death was not the result of a bodily injured caused by an accident", but "resulted from injuries received in an encounter pro-

voked by" McElyea. (Answer to First Amended Complaint, see e.g. para.10, 11,12, 13, 14, 15). Because AIG no longer relies on the "self-inflicted injury" language, plaintiff's contention that there is no evidence to support a "self-inflicted" injury is rendered moot.

3. Defendants rely on the test set forth in *King v. Hartford Life and Accident Ins. Co.,* 357 F.3d 840 (8th Cir.2004). On April 6, 2004, the Eighth Circuit vacated the decision and granted rehearing *en banc.*

the federal courts apply federal common law. *See McDaniel v. Medical Life Ins. Co.,* 195 F.3d 999, 1002 (8th Cir.1999). "Under the federal common law of ERISA, we 'interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience.'" *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1125 (9th Cir.2002) (citation omitted). Furthermore, "[i]n developing federal common law, [the Court] may look to state law for guidance to the extent that state law does not conflict with ERISA or its underlying policies." *Shipley v. Arkansas Blue Cross and Blue Shield,* 333 F.3d 898, 902 (8th Cir.2003).

Defendants argue that McElyea's death was not an accident. They argue that McElyea should have reasonably foreseen his death.

The First Circuit in *Wickman v. Northwestern Nat'l Ins. Co,* 908 F.2d 1077 (1st Cir.1990) noted the difficulty in defining accident.

> Defining accident has troubled the state and federal judiciaries for years. Probably the best definition is Cardozo's tautology that an accident is what the public calls an accident, which aids jurists in deciding individual cases only slightly. As the late Justice Musmanno of the Pennsylvania Supreme Court bemused:
>
> > What is an accident? Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts

made out an accident, the question may not yet be settled, and it must be reheard in an appellate court.

> *Brenneman v. St. Paul Fire and Marine Ins. Co.,* 411 Pa. 409, 192 A.2d 745, 747 (1963);

*Wickman,* 908 F.2d 1077, 1086 –1087 (1st Cir.1990)

The *Wickman* court then set out a formulation which combines objective and subjective inquiries. In determining the injury an accident, the court first asks whether the insured subjectively expected the injury. If the court determines that the insured did not expect an injury similar in type or kind to that suffered, the court must determine whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. If the court finds that there is insufficient evidence to accurately determine the insured's subjective expectation, then the court must engage in an objective analysis of insured's expectations, asking whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct. *Wickman,* 908 F.2d at 1088.

The *Wickman* analysis has been adopted by a number of other courts. *See West v. Aetna Life Ins. Co.,* 171 F.Supp.2d 856, 886 (N.D.Iowa 2001) ("court finds that *Wickman* may be treated as statement of federal common law for the definition of 'accident' under an ERISA plan in which the term is not unambiguously defined")[4]

---

4. The precedential value of *West* may be somewhat in doubt in light of the Eight Circuit's vacation of *King.* The panel in *King* specifically approved the court's analysis in

*West. See King,* 357 F.3d at 843 ("We also approve and follow the excellent application of *Wickman* principles conducted by the district court in *West* ").

*See also Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1126 (9th Cir.2002) (finding that death by autoerotic asphyxiation was accidental as no evidence to suggest insured subjectively expected not to survive)

The Eighth Circuit, while not adopting the *Wickman* approach [5], has addressed the meaning of "accident" in similar situations to the one at bar. In *Estate of Wade v. Continental Ins. Co.,* 514 F.2d 304 (8th Cir.1975) the decedent died of gunshot wounds inflicted by his wife. The decedent and his wife had a long history of domestic quarrels, and on several occasions the wife had been hospitalized after being beaten by her husband. They had divorced, but remarried three months prior to the shooting. Neither had previously threatened each other with a gun. On the night of the shooting, the deceased and his wife had quarreled, and the wife made the statement, "If I had a gun, I would shoot you." The deceased then gave his wife a loaded gun, and told her to go ahead and shoot. She did. The Eighth Circuit, applying Iowa law, found that the death was an "accident."

The court found that under Iowa law the determination of whether an injury is accidental must be made from the point of view of the insured and what he or she intended or should reasonably have expected. "The general rule is that when an insured assaults another and is killed as a consequence of his attack, his death is accidental unless it was a natural and probable result of his own actions, reasonably foreseeable by him or by a reasonably prudent man in his position." *Id.* at 307. In *Wade* there was no evidence that the decedent would reasonably foresee that his wife would actually shoot him.

Notwithstanding the obvious taunt and defiance shown, there is no evidence on the present record to show that Wade would reasonably foresee that his wife would actually shoot him. Given the prior relationship of the parties, there is no evidence from their conduct to suggest that Wade, even though he impulsively dared his wife to do so, would reasonably foresee that result. According to the testimony credited by the district court, Wade neither threatened his wife's life nor pointed the gun at her. *Id.*

In *Jennings v. Jennings,* 109 F.3d 477 (8th Cir.1997), the Eighth Circuit found that the shooting death of the decedent was not an accident. The decedent and Ms. Jennings were divorced. There was a history of verbal and physical abuse. After their divorce, the decedent arrived in the early morning hours at the house where Ms. Jennings, her fiancé, and her children resided. The decedent entered the house, he argued with his ex-wife, and he struck her in the head with his fist. Ms. Jennings' fiancé entered the room with a pistol and fired two warning shots into the floor. The decedent retreated at which point, Ms. Jennings retrieved the gun. The decedent advanced toward Ms. Jennings, and she fired a warning shot. The decedent grabbed Ms. Jennings' hands, telling her to go ahead and shoot him. The gun accidentally discharged, hitting the decedent in the arm. He let go of Ms. Jennings' hands and stepped back, but then raised his fist, said "I will kill you," and advanced toward her. Ms. Jennings fired and killed the decedent. *Id.* at 479.

The court determined that Jennings knew or reasonably should have known that his wife would respond to this attack with deadly force. He was under a restraining order at the time, and several warning shots had been fired by both Ms.

**5.** *See* fn. 3

Jennings and her fiancé. Furthermore, Jennings was shot in the arm prior to the fatal shot.

■ As discussed above, the Court may look to state law for guidance to the extent that state law does not conflict with ERISA or its underlying policies. *Shipley v. Arkansas Blue Cross and Blue Shield,* 333 F.3d 898, 902 (8th Cir.2003). "Under Arkansas law, proof of death of an insured from injuries received by him or her raises a presumption of accidental death within the meaning of an insurance clause insuring against death by external, violent, and accidental means, and the presumption of accidental death will continue until overcome by affirmative proof to the contrary on the part of the insurer." *Cockrell v. Life Ins. Co. of Georgia,* 692 F.2d 1164, 1167 (8th Cir.1982). Furthermore, under Arkansas law, "the killing of an unarmed person by one upon whom he is moving aggressively is by accident or accidental means if the unarmed person did not know and had no reason to believe that his adversary was armed and intended to kill him upon such advance." *Id.* at 1167–68.

■ After considering the facts and applicable law, the Court finds that is no evidence to support that McElyea would have suspected that Reynolds would shoot him. There was no history that Reynolds had ever threatened McElyea with a gun. Although there is a history of violence between Reynolds and McElyea, there is no evidence that the violence ever included the use of weapons.

Furthermore, there is no evidence in support of defendants' position that McElyea continued to advance toward Reynolds after Reynolds pointed the gun at him or after being shot. The most likely scenario according to the statements of Vaughn and Benish was that McElyea first hit Beshears, knocking him down, then Reynolds told McElyea not to come any close. McElyea continued to approach Reynolds at which time Reynolds shot McElyea. There is no evidence from the statements made by the individuals at the time that McElyea continued to approach after he had been shot.[6] There is no evidence that Reynolds had drawn or brandished a gun as McElyea was approaching or that McElyea knew that Reynolds had a gun. Unlike *Jennings,* there were no warning shots or any threats made by Reynolds that he would shoot McElyea if he advanced.

In sum, the Court finds that the death of McElyea was an "accident" and that plaintiff is entitled to accidental death benefits under the Policy.

Plaintiff also contends that AIG violated ERISA by failing to provide her plan documents. Plaintiff states that through her counsel she made the requests for all of the Plan's formal legal documents, including the summary of benefits, on July 2, 2003, July 31, 2003, and August 11, 2003. (JM–AIG–034, 0036, 0049) On August 14, 2003, plaintiff's counsel received a letter from AIG dated July 8, 2003, but postmarked August 9, 2003, stating that the policies were enclosed. They were not. (JM–AIG–0032). On August 15, 2003, plaintiff's counsel notified AIG that that the policies were not enclosed. (JM–AIG–0032). The policies were received on August 25, 2003, but the SPD was never sent.(JM–AIG–0026)

---

**6.** Defendants argue that McElyea continued to advance even after being shot. Other than the report of the Investigator for AIG of his interview with Lt. Vaughn, there is no support for this conclusion according to the statements made at the time of the incident. The investigator's statement is hearsay and it is not reliable, given that Vaughn did not include the statement in his report.

AIG contends that plaintiff's request for the formal legal documents was not sufficient to notify AIG what other documents plaintiff was requesting in addition to the policies.

29 U.S.C § 1024(b)(4) provides that a plan administrator "shall upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, ... or other instruments under which the plan is established or operated." Under 29 U.S.C. § 1132(c)(1)(B), the Court may impose a penalty of up to $100 a day for the failure of the administrator to supply the requested information within 30 day of the request.

A number of courts have addressed the factors to be considered in determining whether a penalty should be imposed. The Eighth Circuit in *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 948 (8th Cir.1999) noted that other courts have generally looked at the prejudice to the plaintiff and the nature of the plan administrator's conduct in assessing a penalty. The court cautioned that prejudiced is not a prerequisite to the imposition of a penalty, and stated "that the purpose of the penalty is to provide plan administrators with an incentive to timely respond to requests for documents." *Id. See Romero v. Smith-Kline Beecham*, 309 F.3d 113, 120 (3rd Cir.2002) (appropriate factors to be considered in assessing penalty include bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary)

 Here, plaintiff made numerous requests for the documents. That AIG believed that the request was not specific enough is disingenuous—plaintiff specifically requested all formal legal documents, including a summary of benefits. The

SPD is one of the documents required to be provided if a participant requests it.

Plaintiff notes that the SPD was the only plan documents which referred to any administrative remedy. Plaintiff filed a lawsuit after waiting more than a year for a determination of her claim without any information as to how she could pursue administrative remedies.

The Court finds that a penalty is warranted. The Court finds that a penalty of $20.00 a day from August 11, 2003, the date of the last request, until the February 12, 2004, the date the administrative record is warranted, for a total of $3700.00.

In sum, the Court finds that plaintiff is entitled to accidental death benefits in the amount of $88,000.00, plus interest, attorney's fees and costs. The Court further finds that AIG shall pay plaintiff the amount of $3700.00 as a statutory penalty for violating 29 U.S.C. § 1132(c)(1).

### *JUDGMENT*

Pursuant to the Memorandum Opinion and Order entered this date, judgment is entered in favor of plaintiff and against defendants. Plaintiff is entitled to accidental death benefits in the amount of $88,000.00, plus interest, attorney's fees and costs. AIG shall pay plaintiff the amount of $3700.00 as a statutory penalty for violating 29 U.S.C. § 1132(c)(1).