Fegan v. State Mutual Life Assurance   CV-95-053-M   09/30/96 P
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Joyce A. Fegan,
        Plaintiff,

        v.                                        Civil No. 95-053-M

State Mutual Life Assurance
Company of America,
        Defendant.


                          O R D E R


        Plaintiff, Joyce A. Fegan, sues defendant, State Mutual Life

Assurance Company of America ("State Mutual"), to recover

accidental death benefits payable under a group insurance policy

covering her husband.  Both parties have moved for summary

judgment.  Fed. R. Civ. P. 56(c).  For the reasons discussed

below, plaintiff's motion for summary judgment is granted and

defendant's motion for summary judgment is denied.


I.    STANDARD OF REVIEW

        Summary judgment is proper "if pleadings, depositions,

answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material

fact "is one `that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Property with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson, 477 U.S. at 256. The party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect brevis disposition." Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992). That burden is discharged only if the cited disagreement relates to a genuine issue of material fact. Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992), cert. denied, 507 U.S. 1030 (1993).

## II. FACTS

The following facts are undisputed. At the time of his death, plaintiff's late husband, Clayton W. Fegan, was employed by Quebecor Printing (USA), Inc., of Brattleboro, Vermont. Plaintiff, Joyce Fegan, is her late husband's sole beneficiary under a group accident insurance policy issued by State Mutual,

2

covering employees of Quebecor Printing.  The policy contained a death benefit, as well as an accidental death and dismemberment benefit.  Each benefit amounted to one and a half times the covered employee's annual pay, or, in this case, $36,000.  The group insurance is a benefit provided through an employee welfare benefit plan established by Quebecor Printing, and so is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.

On August 3, 1993, plaintiff's decedent, while at work, got up from a kneeling position and experienced a pain medial to the right patella.  He was unable to bend his right knee, and, due to that knee injury, left work.  On August 13, 1993, arthroscopic surgery was performed to repair a torn medial meniscus in his knee.  The parties agree that the torn medial meniscus qualified as an "injury" under the terms of the group policy.  The parties also agree that arthroscopic surgery was an entirely accepted medical treatment for this type of knee injury, and that it was skillfully performed.

On August 16, 1993, Mr. Fegan was examined by his orthopaedic surgeon, who noted "difficulty" in the right calf.  A nursing note written the same day describes Mr. Fegan as complaining of calf pain and running a fever.  The orthopaedic

3

surgeon prescribed some medication, physical therapy, and hot soaks. On August 20, 1993, Mr. Fegan told his physical therapist that he had been experiencing right calf pain since the surgery. Three days later he again told the physical therapist that his right calf bothered him, that his calf was swollen, that there was a tightness in his chest, and that he was running a fever. On August 23, 1993, Mr. Fegan called his surgeon's nurse and complained that he was running a fever and that he was experiencing chest pain running to his shoulder. He denied any redness or pain with respect to the treated right knee. The nurse apparently decided that the reported symptoms were unrelated to his knee surgery and suggested that Mr. Fegan contact his primary physician.

Tragically, Mr. Fegan died four days later. He had developed phlebothrombosis, a recognized, though relatively rare complication of arthroscopic surgery, which eventually resulted in the development of fatal bilateral pulmonary emboli. An autopsy report noted the existence of pulmonary infarcts in Mr. Fegan's right lung, which had been clear prior to surgery, and declared the cause of death to be multiple bilateral pulmonary thromboemboli.

The parties have stipulated, for purposes of resolving this benefit eligibility dispute, that the postoperative medical care Mr. Fegan received fell below accepted standards of medical practice, and at least implicitly agree that an acceptable level of care would have prevented Mr. Fegan's death.

The terms of the insurance policy underlying the plan provide for payment of accidental death benefits when: (1) an insured sustains an injury while covered for the benefit; (2) solely as a result of the injury, the insured suffers a specified loss (here, death); and (3) the loss occurs within 90 days of the injury. The policy also contains an exclusion for any loss that "directly or indirectly results from . . . physical or mental sickness."

The policy itself does not define either "accidental" or "injury." A few months after Mr. Fegan's death, however, individual certificates of insurance were issued to employees that defined "sickness" as an "illness, disease, complication of pregnancy or normal pregnancy or its termination," and defined "injury" as "a trauma or damage to some part of the body caused solely by accident and not contributed to by any other cause." (See Stipulated Facts No. 9-11.) The parties accept these

5

definitions as being both reflective of the plan's benefit eligibility criteria and applicable to this case.

State Mutual, as insurer of the plan, paid plaintiff the regular death benefits under the policy, but declined to pay the additional "accidental death benefit," citing the "sickness" exclusion and claiming that Mr. Fegan's death was not caused "solely" by the accidental knee injury. Plaintiff sues for the accidental death benefit.

## III. DISCUSSION

Currently pending are cross-motions for summary judgment. The parties agree, and the court finds, that there are no disputed issues of material fact and judgment can be entered as a matter of law.

Because the issues in this case arise under ERISA, but are not directly addressed by ERISA, the court must look to "federal common law principles suitable for the governance of pension and employee benefit trusts" in order to resolve the dispute. Senkier v. Hartford Life & Acc. Ins. Co., 948 F.2d 1050, 1051 (7th Cir. 1991); see also Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077, 1084 (1st Cir.), cert. denied, 498 U.S. 1013 (1990). The parties agree that State Mutual's denial of

6

plaintiff's accidental death benefit claim constituted a denial of benefits under an ERISA-regulated employee welfare benefit plan,[1] which in this case is reviewed under a de novo standard, the administrator or fiduciary having not expressly retained the right to construe ambiguous plan terms. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

Resolution of this case turns, then, on whether Mr. Fegan was the victim of an "accident" that caused an "injury," which injury was the "sole cause" of his death, and, if so, whether that cause of death (injury) is nevertheless excluded from coverage under the "sickness" exclusion.

Plaintiff argues that two potentially qualifying accidents occurred. One "accident" consisted of or resulted in the knee injury and, plaintiff says, the knee injury (unquestionably a "trauma or damage to some part of his body caused solely by accident") was sufficiently causally related to death as to

---

[1] The benefits provided under the plan are co-extensive with those provided by the insurance policy. "All claims are paid in accordance with the terms of the insurance contract issued to Quebecor Printing by the insurance company." See Quebecor Printing Group Life Insurance Plan, p. L10. The parties tacitly agree that the insurance company is an appropriate stand-in for the plan as a defendant, since the plan benefits are coextensive with and are completely funded through the policy. Accordingly, the court will also consider the company as wearing the plan hat as well as its own.

7

constitute the <u>sole</u> cause. (<u>See</u> Plaintiff's Motion for Summary Judgment, at 3-4.) Another "accident" consisted of postoperative medical negligence, and, plaintiff says, the medical negligence itself can be considered the sole cause of death. (<u>See</u> Plaintiff's Motion for Summary Judgment, at 7-9.)

Defendant counters that although it is willing to concede that the knee injury qualified under the policy as an accidental injury, the knee injury was not the <u>sole</u> cause of death, as required by the policy, because the stipulated post-operative medical malpractice was also causally connected to the death, and hence was at least <u>another</u> cause. "The failure to diagnose the phlebothrombosis in the decedent's right leg is causally related to his death." Stipulated Fact No. 46; <u>see also</u> Stipulated Facts Nos. 29-45. Defendant further argues that medical malpractice cannot qualify as an "accident" within the policy's meaning. Moreover, defendant says phlebothrombosis or pulmonary emboli are not "injuries" as those terms are used in the policy. At a minimum, defendant says, those conditions also constitute "illness" or "disease" and, to the extent they caused Mr. Fegan's death, coverage is excluded.

Both parties agree that, with respect to decedent's knee injury, two of the three prerequisites for coverage are met in

8

this case: (1) the knee injury was an accident; and (2) the insured's death occurred within 90 days of that accidental injury.  The parties disagree, however, as to the third prerequisite: that death resulted solely from that accidental injury.

Because the insurance policy at issue here also operates as an employee welfare benefit plan, its terms are to be defined or construed in the ERISA context.  "[T]erms [under ERISA] must be given their plain meanings, meanings which comport with the interpretations given by the average person."  Wickman, 908 F.2d at 1084.

What generally qualifies as an "accident," as that term is used in policies providing insurance against accidental death, appears to be one of the more philosophically complex simple questions.  In Senkier v. Hartford Life & Accident Insurance Company, 948 F.2d 1050 (7th Cir. 1991), Judge Posner, after reviewing the "welter of conflicting precedent," concluded that Justice Cardozo was right in thinking that "courts could do no better than to leave the question to `common understanding as revealed in common speech.'"  Senkier, 948 F.2d at 1032 (quoting Connelly v. Hunt Furniture Co., 240 N.Y. 83, 85, 147 N.E. 366, 367 (1925)).

In <u>Senkier</u> a patient suffering from an illness (Crohn's Disease) was admitted to a hospital for treatment. A catheter was inserted in a vein to allow intravenous feeding. The patient died several days later when the catheter became dislodged from its original position and migrated to and punctured her heart. Did the patient suffer an "accidental" death? The Seventh Circuit held that she did not, because although accidental in the sense of unintended and infrequent, the term "accident" as used in accidental insurance policies connotes something more.

> The term is used to carve out physical injuries not caused by illness from those that are so caused, and while injuries caused not by the illness itself but by the treatment of the illness could be put in either bin, the normal understanding is that they belong with illness, not with accident.
>
> *     *     *
>
> Where you die from the standard complications of standard medical treatments you don't, it seems to us, die in or because of an accident; your death is the result of illness.

<u>Senkier</u>, 948 F.2d at 1052, 1053.

<u>Senkier</u>, however, while informative and instructive, is not precisely on point here (nor is it controlling in this circuit). <u>Senkier</u> stands firmly for the proposition that if an insured

10

suffers from an illness, and dies as a result of standard medical treatment for that illness, or even from a _medical_ mishap related to that treatment, the death is properly classified as one due to illness, and not due to "accident" as that term is employed in accident insurance policies.  (One might also suggest that _Senkier_ stands for the converse proposition, that if one suffers an accidental _injury_ and receives appropriate medical treatment for the injury, but dies due to a standard complication of that treatment, the death is properly classified as an "accident.") _Senkier's_ rule, even limited as it appears to be to medical treatment of _illnesses_, seems overly broad and artificially categorical — at least some acts by medical professionals could well qualify as both "malpractice" and "accidental," particularly if the common language approach is used to determine what ordinary people would think is and is not "accidental" within the meaning of accident insurance.  Whether the Court of Appeals for the First Circuit would adopt such a broad and seemingly inflexible rule as that announced in _Senkier_ seems doubtful, but in any event, the Seventh Circuit does seem to agree, conceptually, that

> It would be different if [the insured]
> twisted his knee playing tennis and the
> injury caused blood clots that embolized to

11

> his lungs and killed him. [citations
> omitted] Then the means of death — the
> injury to the knee — would be an accident,
> and the death would be covered.

Senkier at 1052.

One of the precedents relied on as support for the "twisted knee" illustration, Insurance Company of North America v. Thompson, 381 F.2d 677 (9th Cir. 1967), adopted the view that ". . . adverse results of medical treatment necessary properly to diagnose and treat the effects of an injury covered by a policy of accident insurance may be found to have been caused by that injury . . . . That adverse reactions to medical attention are unexpected, as they almost always are when the attention produces grave additional harm, does not necessarily break the chain of causation." Id., 681.

Similarly, in Chase v. Business Men's Assur. Co. of America, 51 F.2d 34 (10th Cir. 1931), the Tenth Circuit, applying the same "ordinary-language approach" adopted in Senkier and in this circuit,[2] explained:

> It is difficult, if not impossible, to draw
> an exact line of demarcation between bodily
> injuries and bodily diseases. The two

---

[2] See Wickman v. Northwestern Nat. Ins. Co., 908 F.2d at 1087-88.

12

concepts are not always exclusive of each other; they often overlap. Pathogenic bacteria or disease germs may be taken into the system through the nose, the mouth or other normal channels of entry. Usually the absorption into the system is incidental to a normal bodily process. In such cases where disease follows, common understanding looks upon, and common speech describes the introduction of such germs into the system as the contracting of a disease rather than the suffering of an accidental injury. On the other hand, where the channel of infection is abnormal in that it results from trauma, -- a bruise, a cut, a wound -- the layman views, and in his everyday speech describes the event as an accident.

It is true that <u>where an accidental injury to the body brings about or causes a disease, which in turn causes death, the cases generally hold the accidental means is the cause of such death</u>. In such a case, the disease is an effect of the accident, the incidental means produced and used by the original cause, the accident, to bring about its fatal effect, a mere link in the chain of causation between the accident and the death; and the death is attributable to the accident.

<u>Chase</u>, at 36 (emphasis added) (citations omitted).

Applying those analytical principles, the court is persuaded that Mr. Fegan died as the sole result of an injury caused by an accident, and his beneficiary is entitled to the insurance benefit.

13

This case, like all such cases, is fraught with difficulty and could be (and indeed has been) persuasively argued either way — for and against coverage.  But the parties have made the task less difficult than it otherwise might be by agreeing to the pertinent facts.  We know, in this case, by agreement, that the insured suffered from a knee injury; that the injury was accidental; that he was treated appropriately in that he underwent arthroscopic surgery; that the surgery was skillfully performed; that he developed phlebothrombosis post-operatively; that the phlebothrombosis was causally related to the surgery — a foreseeable and standard medical complication, though rare (and perhaps an "illness" or "disease"); that the phlebothrombosis occasioned the migration of emboli resulting in multiple bilateral pulmonary thromboemboli, which proved fatal. Therefore, because the pulmonary thromboemboli and phlebothrombosis were effects of the accidental injury resulting from appropriate surgical treatment, and certainly were "adverse results of medical treatment necessary properly to diagnose and treat the effects of an injury covered by a policy of accident

14

insurance," INA v. Thompson, supra, at 681, the resulting death is attributable to the accidental knee injury.[3]

The illness or disease exclusion does not apply, because to the extent the phlebothrombosis or pulmonary thromboemboli are properly considered as diseases or illnesses at all, here those conditions were directly caused by the accidental injury, and were mere links in the causal chain tieing the knee injury to the death. Therefore, those conditions are not properly included under the terms "disease" or "illness" as those terms are used and meant to be understood in the policy's coverage exclusion.

Defendant's primary argument, however, is that in order to be covered, the insured's death must have been caused solely by

---

[3] If "accident" means any unintended or unexpected event or circumstance, then any act of medical malpractice could probably qualify as an accident, because it would be outside the course of the intended medical treatment and unexpected. But, generally speaking, most people intuitively understand that a death resulting from substandard medical care is usually not "accidental," at least not in the sense intended by accident insurance policies. While Senkier would seem to rule out the possibility of an accidental death in the context of any medical care or medical mishap, there are probably some circumstances or events associated with medical treatment that might well qualify as both medical malpractice and an "accident" within the meaning of an accident insurance policy. All medical malpractice would not qualify as an accident under accident insurance policies, and here it is very doubtful that "failure to properly diagnose and treat" would qualify as an "accident." Nevertheless, it is not necessary to decide that issue in this case, despite the parties' respective focus on it, because the knee injury suffices to trigger coverage.

15

the accidental injury and here, even if the death is attributed to the knee injury, there were other, additional (and coverage-defeating) causes. Specifically, defendant says the stipulated post-operative medical malpractice caused or contributed to cause the death. So, the benefit is not payable because the knee injury was not the sole cause of loss.

It is a seductive, and not altogether unpersuasive argument, but it fails. The insured's death was caused by the knee injury, as explained above (accident — knee injury — appropriate medical treatment — standard foreseeable complication — adverse result — death). Medical malpractice "caused" the insured's death[4] only in the sense that, presumably, had the medical care been non-negligent, the linked procession from knee injury to death set in motion by the accident would likely have been interrupted, the course altered, and the insured's death averted. No doubt the medical professionals owed a legal duty to the insured to adequately diagnose and treat his surgical complications, and breach of that duty could be said, for tort liability purposes,

_____

[4] Of course, the court expresses no opinion on whether medical malpractice actually occurred — the parties stipulated for purposes of resolving this benefit dispute that medical negligence was causally related to the insured's death, and it is only in that context, and based on that agreement, that the court assumes the care to have been substandard and causally related to the death.

16

to have proximately caused the death.  But tort liability, arising from the breach of a legal duty to intervene and alter the inexorable course toward death set in motion by the knee injury, is not the type of "cause" that is meant to be excluded by an accident insurance policy when it requires that a loss be occasioned solely by the accident and no other cause.

The point is perhaps illustrated by an example.  If an insured accidentally struck his head on a diving board suffering an injury that rendered him unconscious, fell into a swimming pool, and drowned, the death would undeniably be "accidental" within the meaning of the policy at issue here.  The insurance company would not be heard to argue later that the accidental head injury was not the sole cause of death because a lifeguard, assigned to the pool and on duty, negligently ignored the diver's condition until it was too late — even if the drowning death would have been easily averted had the lifeguard simply not breached his duty to watch carefully and act in conformity with the applicable standard of care.  Would the lifeguard be liable in tort for the death?  Undoubtedly.  Would the lifeguard have "proximately caused" the death?  Yes.  But would the death be excluded from coverage under an accident insurance policy like the one at issue here because the accidental injury was not the

17

<u>sole</u> cause of death, given the lifeguard's stipulated negligence and its "causal" connection to the death?  No, the policy would cover the loss despite the lifeguard's negligence.  Reasonable people in the position of the insured would intuitively understand the death to be "accidental."

Here, the insured should not have died from a relatively simple knee injury treated in a comparatively routine way.  But he did.  Post-operative complications like phlebothrombosis and pulmonary embolism may be rare following arthroscopic surgery, but they are foreseeable, and can lead directly to the patient's death.  <u>See, e.g.</u>, Affidavit of Peter C. Altner, M.D., Exhibit I(1), attached to Plaintiff's Motion for Summary Judgment.  That medical personnel breached their duties of due care post-operatively, and could (presumably) have, like the lifeguard, easily intervened and averted a needless death, will likely render them liable in tort, their breach having "proximately caused" the death.  But that negligent failure to properly treat the phlebothrombosis is not the type of "additional cause" contemplated by the policy language as sufficient to negate coverage.

Parenthetically, the court is mindful that this policy does not specifically exclude coverage for losses related to medical

18

treatment or medical malpractice.  If the company intended to exclude coverage for accidental deaths that could have been avoided, but were not due to medical treatment mishaps or malpractice, it could easily have made that clear.  A common understanding of the common terms actually used in the policy at issue here would lead an ordinary and reasonable insured to believe that however unlikely, however freakish, however avoidable by the intervention of medical professionals duty bound to act with due care to prevent it, _if_ he were to die as the result of an accidental injury, the policy would provide a death benefit to his beneficiary.

## IV.  CONCLUSION

Defendant's motion for summary judgment (document no. 16) is denied.  Plaintiff's motion for summary judgment (document no. 25) is granted.  Judgment shall be entered in favor of plaintiff.

**SO ORDERED.**


_____
Steven J. McAuliffe
United States District Judge

September 30, 1996

cc:  John A. Bell, Esq.
      William J. Robinson, Esq.