**Angela MCAFEE, individually, and Angela McAfee, as next friend of, as natural guardian of, and as guardian of the property of David Russell McAfee, Jr., Brandon Charles McAfee, and Michael Chase McAfee, minors, Plaintiffs,**

**v.**

**TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY, Defendant.**

**No. 1:99–CV–01975–CAP.**

United States District Court, N.D. Georgia, Atlanta Division.

July 28, 2000.

---

Ronald Arthur Lowry, Marietta, GA, for Plaintiffs.

H. Sanders, Jr., Carter & Ansley, Atlanta, GA, for Defendant.

## *ORDER*

PANNELL, District Judge.

The plaintiffs brought the instant breach of contract action, alleging that the defendant failed to pay them benefits due under an accident and death insurance policy. The matter is currently before the court on the plaintiffs' motion for summary judgment and the defendant's cross-motion for summary judgment. In analyzing a summary judgment motion, the court resolves all issues of fact in favor of the non-movant. *See Cottrell v. Caldwell,* 85 F.3d 1480 (11th Cir.1996). Here, because both parties have moved for summary judgment and the court finds in favor of the defendant, it states the facts of the case in the light most favorable to the plaintiffs. Therefore, the facts, as stated below, may not prove to be the facts that would be established at trial. *See Hartsfield v. Lemacks,* 50 F.3d 950, 951 (11th Cir.1995) (citing *Rodgers v. Horsley,* 39 F.3d 308, 309 (11th Cir.1994)).

## I. *BACKGROUND FACTS AND PROCEDURAL HISTORY*

One of the plaintiffs, Angela McAfee, is the widow of David Russell McAfee, and, she, along with her children, brought this action in the Superior Court of Fulton County, Georgia, to recover accidental death benefits payable to them for the death of her husband. The defendant removed the case to this court on the basis of federal question jurisdiction, specifically the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., which governs the insurance policy. *See* 28 U.S.C. § 1331.

On January 1, 1997, the defendant issued a group policy to the Lockheed–Martin Corporation, Mr. McAfee's employer (the "Policy"). The Policy provided accidental death and dismemberment benefits to eligible employees, including Mr. McAfee, as part of an employee welfare benefit plan. The plaintiffs were the beneficiaries of Mr. McAfee's coverage. The Policy provided that benefits were payable for "losses resulting directly and independently from all other causes from bodily injuries caused by an accident." The Policy does not define the term "accident," but, rather, provides the following exclusions:

This Policy does not cover loss caused by or resulting from any one or more of the following:

A. Intentionally self-inflicted injuries

B. Suicide or any attempted suicide, while sane or insane; . . .

C. Illness, disease, bodily or mental infirmity . . . .

In August 1998, the defendant received the plaintiffs' claim for accidental death benefits under the Policy as the result of Mr. McAfee's death on May 11, 1998. The death certificate identified the immediate cause of death as "Multiple Gunshot Wounds of the Chest and Back." A newspaper article submitted with the claim form provided:

A Lawrenceville man who died Monday in a hail of police bullets was devoted to his family and reeling at the prospect of divorce, his mother said.

But police who responded to a reported armed robbery at a Windy Hill Road convenience store knew only that David Russell McAfee, 37, had a rifle, and that he shot at them.

The officers returned fire, and when the shooting stopped, McAfee was dead from multiple gunshot wounds. Only later did detectives learn that McAfee had twice attempted suicide in the past year, authorities said.

Just after midnight Monday morning, police said McAfee, carrying a lever-action rifle, approached a clerk at the BP convenience store. He demanded beer, but the clerk locked the door and called 911, said Marietta police Lt. Wayne Kennedy. As officers arrived, McAfee jumped into his van and drove to the nearby Crab House Restaurant on Cobb Parkway, where police boxed him in, Kennedy said.

Officers could see McAfee sitting in the back of the van, holding the rifle, but he did not respond when ordered to put the weapon down, Kennedy said. Finally, McAfee pointed the rifle toward the officers and fired a shot, Kennedy said. Four officers—two from the Cobb police department and two Marietta officers—shot back at least 23 times from the shell casings found at the scene, he said. In addition to the rifle, a shotgun was found in McAfee's van, Kennedy said.

Because of the circumstances of Mr. McAfee's death, the defendant obtained copies of the reports of the Cobb County Medical Examiner's Office, the Marietta Police Department, and the Cobb County Department of Public Safety. The Cobb County Medical Examiner's report provided the following description:

Preliminary information was the victim had entered the parking lot of the BP gas station at Cobb Parkway and Windy Hill Road and demanded alcoholic beverages from the attendant. The attendant of the gas station contacted 911 and police officers responded to the location. Upon the police officers arrival at the BP gas station the victim was pursued leaving the gas station south on Cobb Parkway and was eventually cornered and in the parking lot for the Crab House restaurant.

The victim displayed a rifle from the vehicle and discharged the rifle in the direction of the police officers. The police officers returned fire striking the victim multiple times.

The Marietta Police Department report included the following descriptions of the incident provided by several participating police officers:

I arrived in the lot and observed Officers Langley and Honea running from there [sic] vehicles away from a blue van. I observed the suspect sitting in the driver seat armed with what looked like a shotgun.

I gave the suspect continuous [sic] voice commands to drop the gun. At this time several other units had arrived on the scene. I observed the subject climb from the front seat to the back seat. The suspect then exited the vehicle on the passenger side and walked toward John Smith Chevrolet. I then left the cover of my vehicle and moved behind a vehicle parked just to the right of the suspect vehicle. At this time the suspect got back into the back seat on the passenger side. I again ordered him to put down the weapon. The suspect then pointed the gun out the door and fired a round into the air and started to bring the gun to level. At this time I discharged my duty weapon at the suspect[.] I could not advise how many rounds I fired.

. . .

As I approached the vehicle the suspect displayed a shotgun from inside the vehicle. I exited my vehicle and took a cover position. After several commands by other officers to drop the gun, the suspect fired at police. Officers returned fire, injuring the suspect.

. . .

I took cover behind a vehicle in the area of two Cobb County police officers. On [sic] of the officers had [a] shotgun and the other had a handgun. Both were pointed at a van in the parking lot [of] the Crab House. The van had the passenger side facing me with the side door open. In the van, I observed a white male with a rifle in his hands. The rifle had a scope on it.

The male in the van was pointing the . . . rifle in all directions including towards several police officers. The male then put the rifle out the side door of the van, pointed it at about a 45 degree angle in the air towards Cobb Parkway. The male then discharged one round from the rifle. The male then started to lower the rifle. At that time, I observed the two Cobb County police offices return fire at the van. The male in the van fell back into the van into the seat behind the drivers seat.

. . .

In front of the van I could see numerous police vehicles and could hear an officer on the loud speaker of a patrol vehicle. The officer on the loud speaker was giving commands to the subject in the van to put his weapon down and come out of the van with his hands up. I then saw the subject in [the] van open his side sliding door point his shotgun up in the air and fire a shot into the air. At that point I heard numerous shots fired from police personnel and saw the shots from the police strike the van.

. . .

Officer Freer yelled for the suspect to put the weapon down several times but the suspect responded by shaking his head no . . . . The suspect again proceeded to exit the van and discharged the firearm at which time officers . . . returned fire striking the suspect several times . . . .

The report of the Cobb County Department of Public Safety concerning an internal investigation of the incident in part concluded:

David McAfee had demonstrated no desire to surrender to Police. Verbal instructions were repeatedly given for McAfee to put down his weapon. The Officers were clearly able to see that the weapon McAfee had in his hands was a coped rifle. All officers present demonstrated constraint up until the time that McAfee discharged his weapon. Officers were utilizing cover behind automobiles although there [sic] cover was minimal considering the penetrating power of the rifle that McAfee possessed.

The weapons that McAfee had in his vehicle were as follows:

1) Marlin 30–30 rifle with scope

2) Stevens 12 gauge shotgun

3) Marlin .22 rifle

The Cobb County Department of Public Safety concluded that "David McAfee manifested intent to do bodily harm to other[s]" and, by implication, not himself.

By letter, dated October 15, 1998, the defendant advised the plaintiffs of the denial of their claim for accidental death benefits. The letter stated in pertinent part:

> In consideration of your claim for accidental death benefits under this policy, we have made inquiries into the circumstances of your husband's death. Our inquiries disclosed that Mr. McAfee's conduct by firing at the police resulted in his death. To qualify for benefits, it must be established that the death resulted, independently of all other causes, from an accidental bodily injury. Based on our investigation, this claim does not qualify for benefits under the terms and conditions of the policy.
>
> A copy of the policy page regarding "Exclusions/Limitations" is enclosed. Please note that the policy does not cover loss caused by or resulting from any one or more of the following:
>
> A. Intentionally self-inflicted injuries;
>
> B. Suicide or any attempted suicide while sane or insane.
>
> Mr. McAfee by firing at the police intentionally caused self-inflicted injuries and as a result of his conduct expected to die. This calls into play the exclusion for death resulting, directly or indirectly, from intentionally self-inflicted injuries. We also assert the suicide or attempted suicide limitation. Since your husband's death was not due to accidental bodily injury, and because it was due to intentionally self-inflicted injuries, suicide or attempted suicide no benefits are payable.

By letter, dated December 18, 1998, the defendant received Mrs. McAfee's notice of a request and/or appeal of the denial of the claim for life insurance proceeds. Her letter requested additional time in which to provide a police tape and further information about her husband's death, because those materials were presently unavailable. The defendant also contends that that letter informed the plaintiffs of their right to appeal the defendant's decision within sixty (60) days. The plaintiffs counter that no such notice was provided. Further, they argue that the letter was not received by them until a much later date. The defendant's letter was not sent by return-receipt, and, therefore, ultimately the date of receipt is a jury question.

On March 1, 1999, the defendant received Mrs. McAfee's third letter which included copies of a police videotape recording of Mr. McAfee's death, the Cobb County Medical Examiner's Report, and the Investigator's Report. Thereafter, the defendant reviewed the claim and the additional materials, and again denied payment.

## II. *LEGAL DISCUSSION*

### A. *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir.1984). The moving party's burden is discharged merely by " 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to

the party opposing the motion. *See Bradbury v. Wainwright,* 718 F.2d 1538, 1543 (11th Cir.1983). Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide genuine issues of material fact but to decide only whether there is such an issue to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The applicable substantive law will identify those facts that are material. *See Anderson,* 477 U.S. at 247, 106 S.Ct. at 2510. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material. *See id.*

Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant. *See id.* In order for factual issues to be "genuine" they must have a real basis in the record. *See Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no " 'genuine issue for trial.' " *Id.* (citations omitted).

Here, both parties have filed motions for summary judgment. Having carefully reviewed the record, the court notes that the only disputed issue of material fact is whether the term "accident" or "suicide" encompasses what ended Mr. McAfee's life. Although the court recognizes that there are disputed issues of fact, those facts are not material to the legal issues raised in this case. Where necessary, the court has noted the non-material issues of fact, but, otherwise, the court addresses the following case-specific legal issues based upon the uncontested material facts.

## B. *The Standard of Review*

■ Having reviewed the complaint and the remaining record, the court notes that the plaintiffs' action could have been brought pursuant to 29 U.S.C. § 1132(a)(1)(B) of ERISA, which allows a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . ." Although the complaint at best merely alleges a breach of contract claim, the subsequent pleadings illustrate that this case falls under the rubric of ERISA law. A plaintiff suing under Section 1132(a)(1)(B) bears the burden of proving his entitlement to contractual benefits. *See Horton v. Reliance Standard Life Insurance Company,* 141 F.3d 1038, 1040 (11th Cir.1998) (citing *Farley v. Benefit Trust Life Ins. Co.,* 979 F.2d 653, 658 (8th cir.199)2). If the insurer, however, claims that a specific exclusion applies to deny the insured benefits, as here, the insurer must prove that the exclusion prevents coverage. *See id.*

■ Because the accidental death benefits in question in this case were issued pursuant to ERISA, the denial of those benefits must be reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). If such discretionary authority is conferred, a court must review the denial of benefits under the arbitrary and capricious standard. *See Lee v. Blue Cross and Blue Shield of Alabama,* 10 F.3d 1547, 1550 (11th Cir.1994). The application of the arbitrary and capricious standard requires the court to look only to the facts known to the administrator at the time the decision was made to deny benefits. *See id.* at 1550. From this information, the court must determine if the claimants have proposed a sound interpretation of the plan to

rival the administrator's. *See id.* If the court finds that they have done so, then it must evaluate whether the administrator was arbitrary and capricious in adopting a different interpretation. *See id.* Simply, the court's function is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made. *See Jett v. Blue Cross and Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989).

⬛⬛⬛ "Nonetheless, 'a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary ... unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries'." *Id.* (quoting *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566–67 (11th Cir.1990)). Further, the Eleventh Circuit has held that an inherent conflict of interest exists when benefits determinations are made by an insurance company which is administering its own policy. *See Brown,* 898 F.2d at 1561–63. When such a conflict exists, the court must still review the insurance company's denial of the claim under the arbitrary and capricious standard, but the degree of deference given by the court to the insurance company's decision may be less than in instances where no conflict exists. *See id.* at 1564; *see also generally Anderson v. Blue Cross and Blue Shield of Alabama,* 907 F.2d 1072 (11th Cir.1990).

⬛⬛ When, as here, such a conflict exists, the court must first determine, *de novo,* whether the fiduciary's benefits determination was correct. *See Brown,* 898 F.2d at 1566 n. 12. In making that determination, the court may consider evidence that was not considered by the insurance company at the time it made its benefits determination. *See Moon v. American Home Assurance Co.,* 888 F.2d 86, 89 (11th Cir.1989). If the court determines that the insurance company's decision was correct, the decision to deny the benefits

claim must be affirmed. On the other hand, if the court finds that the fiduciary's decision was wrong, then it must determine if the decision was arbitrary and capricious. *See Brown,* 898 F.2d at 1566–67 n. 12; *Anderson,* 907 F.2d at 1076.

### C. *The Policy*

In light of the foregoing Eleventh Circuit law, the broad discretionary authority afforded to the defendant in determining eligibility for benefits and in construing the terms of the Policy and the defendant's pecuniary interest in the matter, the court must closely scrutinize the defendant's decision to deny the plaintiffs' claim for insurance proceeds. The plaintiffs contend that Mr. McAfee died as a result of his accidental shooting-death by the police. The defendant counters that Mr. McAfee died of self-inflicted wounds or alternatively as a result of suicide, because he knew he was going to die. Collaterally, the defendant asserts that the plaintiffs' claim was barred, because their administrative appeal was untimely.

As previously mentioned, the Policy does not define the term "accident," but, it does exclude coverage from death or dismemberment caused by intentionally self-inflicted injuries; suicide or any attempted suicide, while sane or insane; or illness, disease, bodily or mental infirmity. Thus, the terms of the Policy only define what is not an accident, thereby leaving to the court the question of what constitutes an accident under the Policy. The Policy, however, makes clear that if Mr. McAfee died accidentally, the plaintiffs can recover.

### 1. *"Accident" under Georgia Law*

⬛⬛ Under Georgia law, in order to recover their accidental death benefits, the plaintiffs must prove by a preponderance of the evidence that Mr. McAfee's death was caused by an accident. *See Allstate Insurance Company v. Grayes,* 216 Ga. App. 419, 420, 454 S.E.2d 616 (1995); *and see Life Insurance Company of Georgia v.*

*Dodgen,* 148 Ga.App. 725, 731, 252 S.E.2d 629 (1979). If the plaintiffs meet this burden, then the burden shifts to the defendant to prove the applicability of the "death by self-inflicted injuries" or suicide exclusions. *See Dodgen,* 148 Ga.App. at 731, 252 S.E.2d 629; *John Hancock Mutual Life Insurance Company v. Dutton,* 585 F.2d 1289, 1292 (5th Cir.1978).[1]

■■■ Georgia courts interpret accidental death clauses in insurance policies as requiring a showing that death occurred by "accidental means." *Grayes,* 216 Ga. App. at 421, 454 S.E.2d 616; *Winters v. Reliance Standard Life Insurance Company,* 209 Ga.App. 369, 370, 433 S.E.2d 363 (1993). There is a definite distinction between "accidental injuries" and "injuries resulting from accidental means" for purposes of insurance recovery. *See id.* When an injury is unexpected but arises from a voluntary action, it is not an "accidental injury." *Winters,* 209 Ga.App. at 370, 433 S.E.2d 363. For an injury to result from "accidental means," it must be shown that the injury was one which was the unexpected result of an unforeseen or unexpected act that was involuntarily and unintentionally done. *See id.* Simply, the term "means" is synonymous with "cause." *Id.*

Consequently, policy language which, as here, insures against bodily injury or death caused by an accident, insures against unforeseen injuries caused by "accidental means." *Grayes,* 216 Ga.App. at 421, 454 S.E.2d 616; *Winters,* 209 Ga.App. at 370, 433 S.E.2d 363. That is, it must appear that the insured's death or injury arose by means which were accidental. *See id.* However, when an unusual or unexpected result occurs, by reason of the doing of an intentional act with "no mischance, slip, or mishap occurring in the doing of the act itself," the ensuing injury or death is not caused by accidental means. *Winters,* 209 Ga.App. at 370, 433 S.E.2d 363.

### 2. *The Cause of Mr. McAfee's Death*

■■■ The defendant concludes in its October 15, 1998 letter that Mr. McAfee's death was a result of his "firing at the police." The plaintiffs, however, argue that this statement contradicts the defendant's own evidence contained in the police reports. Without exception, the police officers at the scene describe how Mr. McAfee pointed his rifle up in the air and only as he was lowering the weapon did they open fire. The record is completely devoid of any evidence that Mr. McAfee ever directly fired his weapon at anyone, himself included. A review of the medical Examiner's Report reveals that Mr. McAfee died from a "homicide-gunshot-handgun." The investigator found that the "victim [Mr. McAfee] was shot multiple times by police during intervention; victim was transported . . . resuscitative efforts failed. . . ." Mr. McAfee suffered sixteen (16) bullet wounds; none of which were fired by him. Accordingly, the court finds that Mr. McAfee did not on the day in question die from self-inflicted wounds nor commit suicide in a literal or figurative sense. While the defendant would have the court liken Mr. McAfee's actions to a modern *Butch Cassidy and the Sundance Kid,* the court will not find suicide where the legal cause of death was not self-inflicted.

■■■ The court's inquiry, however, does not end with its finding that the defendant incorrectly concluded the cause of Mr. McAfee's death. Rather, the court also finds that the defendant had a conflict of interest in making its coverage determination, because its restrictive interpretation of the policy allowed it to deny the claim and save the money it would have paid if the claim had been allowed. Further, the court holds that it is arbitrary and capricious for an insurer to deny a claim based upon an interpretation of "accident" that is not stated in the policy and that is contrary to the expectations of the ordinary

---

1. The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

insured. Mr. McAfee purchased and paid the premiums on the Policy to protect his family in case of "accidental" death. Thus, having found that the Policy does not define that term and that the defendant incorrectly concluded that Mr. McAfee committed suicide, the court must determine whether Mr. McAfee's death was of the type of "accident" usually contemplated by the ordinary insured and whether his death resulted from the general understanding of that term. *See Buce v. National Serv. Industries, Inc.*, 74 F.Supp.2d 1272, 1276 (N.D.Ga.1999).

### D. *The Insured's Expectation*

 The plaintiffs strenuously argue that in the Eleventh Circuit when the evidence is inconclusive as to whether the deceased died by accidental or intentional means, the court may use certain legal presumptions against suicide and in favor of accidental death. *See Horton*, 141 F.3d at 1040. The court agrees that these presumptions permit it to resolve coverage questions where the evidence of how the insured died is inconclusive. *See id.* More importantly, the court notes that the Eleventh Circuit has clearly held that ERISA preempts state law and authorizes federal courts to create federal common law to implement Congress' statutory scheme. *See Branch v. G. Bernd Co.*, 955 F.2d 1574, 1580 (11th Cir.1992).

Similar to *Buce*, the court is presently faced with the "question of whether to frustrate the statutory scheme of ERISA by adhering to the metaphysical distinction between 'accidental means' and 'accidental results' that has bedeviled the courts for more than 60 years." 74 F.Supp.2d at 1276; *and see Landress v. Phoenix Mut. Life Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934). The court is well aware of Justice Cardozo's dissent in *Landress*, stating that:

[t]he attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog. Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident. . . . On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company. . . . When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means. . . .

*Landress*, 291 U.S. at 499, 54 S.Ct. 461, 78 L.Ed. 934. The court agrees that the trend in recent years has been to climb out of the "Serbonian Bog,"[2] abolish the distinction between accidental "means" and accidental "results," and find that "the unexpected consequences of an individual's voluntary behavior provide the accidental element for purposes of an insurance policy." *Harrell v. Minnesota Mutual Life Ins. Co.*, 937 S.W.2d 809, 813 (Tenn.1996); *but see Cates v. Metropolitan Life Ins. Co.*, 149 F.3d 1182 (6th Cir.1998) (declining to follow *Harrell*); *and see Buce*, 74 F.Supp.2d at 1276–79.

 Importantly, there is no controlling Eleventh Circuit authority as to whether this type of death constitutes an "accident" under an accidental death policy, when the policy fails to define accident and provides for only certain exclusions. *See Schultz v. Metropolitan Life Ins. Co.*, 994 F.Supp. 1419, 1421 (1997); *Horton*, 141 F.3d at 1041. In *Buce* the court found that:

[r]eading a foreseeability exclusion into the policy would frustrate the Congres-

**2.** For additional references to "Serbonian Bog," *see* John Milton, Paradise Lost, bk. 2, 1.592 (1662) ("A gulf profound, as that Serbonian bog Betwixt Damiata and Mount Casius old, Where armies whole have sunk"); *see* *also* "Dedication to Hon. William Hughes Mulligan," 65 Fordham L.Rev. 17–18 (1996); *and see Air France v. Saks*, 470 U.S. 392, 406, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).

sional purpose of protecting ERISA plan beneficiaries. It would not contribute to uniformity in the administration of employee benefit plans. A foreseeability exclusion contributes to uncertainty and difficulty of administration.

*Buce,* 74 F.Supp.2d at 1278. This court agrees that "an insured should not have to consult a long line of case law or law review articles and treatises to determine the coverage he or she is purchasing under an insurance policy." *Id.* at 1278 (quoting *Harrell,* 937 S.W.2d at 814). The facts in this case, however, require the court to make a distinction of an altogether different sort. Unlike the cases addressed in *Buce,* this court is presented with an insured, whose actions are so unreasonable, ill-conceived, and extreme, that the court can not torture any known definition of the term "accident" to find that he died accidentally.[3] Therefore, this court holds that the "starting point for determining whether an injury was accidental under terms of a policy is 'the reasonable expectations of the insured when the policy was purchased.'" *Walker v. Metropolitan Life Ins. Co.,* 24 F.Supp.2d 775, 780 (E.D.Mich.1997) (quoting *Wickman v. Northwestern National Insurance Company,* 908 F.2d 1077, 1088 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990)).

Accordingly, due to the insured's voluntary behavior which resulted in his death under these particular circumstances, this court holds that "[i]f the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were unreasonable." *Wickman,* 908 F.2d at 1088. In making that determination, reasonableness must be analyzed "first from the subjective per-

spective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." *Walker,* 24 F.Supp.2d at 780. If the evidence is insufficient to determine the insured's subjective expectation, then reasonableness must be determined from the objective perspective. *Wickman,* 908 F.2d at 1088–89. Under the objective analysis, the fact-finder must determine whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct. *See id.* at 1088. Applying this test to the instant facts viewed in the light most favorable to the plaintiffs, the court finds that Mr. McAfee's death was not accidental, because a reasonable person, with his background and experience, knew or should have known that serious bodily injury was a probable consequence substantially likely to occur as a result of his actions. *See McLain v. Metropolitan Life Ins. Co.,* 820 F.Supp. 169, 178 (D.N.J. 1993); *and see Wickman,* 908 F.2d at 1089; *see c.f. Parker v. Danaher Corp.,* 851 F.Supp. 1287, 1294–95 (W.D.Ark.1994) (holding that death as a result of autoerotic asphyxiation is not an accident within the meaning of an accidental death policy); *International Underwriters, Inc. v. Home Ins. Co.,* 662 F.2d 1084 (4th Cir.1981). For the same reasons, the court finds that the defendant's denial of benefits in this case was not arbitrary or capricious. Thus, although the defendant has failed to demonstrate that any of the Policy's exclusions apply, the plaintiffs have similarly failed to present any evidence that Mr. McAfee's death was caused by accidental means. Because the court concludes that Mr. McAfee's death was not an accident as

---

3. For federal courts reviewing ERISA cases that have recognized that foreseeable harm resulting from an insured's intentional actions are not accidental *see generally Landress v. Phoenix Mut. Life Ins. Co.,* 291 U.S. 491, 499, 54 S.Ct. 461, 78 L.Ed. 934 (1934); *Walker v. Metropolitan Life Ins. Co.,* 24 F.Supp.2d 775, 780 (E.D.Mich.1997); *Smith v. Life Ins. Co. of North America,* 872 F.Supp. 482 (W.D.Tenn.

1994); *Fowler v. Metropolitan Life Ins. Co.,* 938 F.Supp. 476 (W.D.Tenn.1996); *Wickman v. Northwestern National Insurance Company,* 908 F.2d 1077 (1st Cir.), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990); *Morton v. Smith,* 91 F.3d 867 (7th Cir.1996); *Senkier v. Hartford Life and Acc. Ins. Co.,* 948 F.2d 1050, 1053–54 (7th Cir.1991).

a matter of law, the plaintiffs may not recover accidental death benefits under the Policy. To allow the plaintiffs to recover under these facts would defeat the purpose of accidental life insurance, by requiring the court to focus solely on the specific intent of the insured, instead of looking to both the decedent's intent and whether the insured's expectations were reasonable for one of the insured's background. *See Wickman*, 908 F.2d at 1088–89; *Walker*, 24 F.Supp.2d at 782. Accordingly, the defendant's decision to deny benefits under the Policy was not unreasonable and is upheld. *See Jett*, 890 F.2d at 1139. The court does not address the "Spouse Retraining Benefit" as the plaintiff did not make a claim for it. Thus, the plaintiffs are not entitled to recover any benefits under the Policy, including the "Surviving Spouse Benefit."

## III. *CONCLUSION*

For the foregoing reasons, the court hereby GRANTS the plaintiffs' motion to file reply brief in support of summary judgment out of time [Doc. No. 37–1], DENIES the plaintiffs' motion for summary judgment [Doc. No. 23–1], and GRANTS the defendant's cross-motion for summary judgment [Doc. No. 25–1].